Downey, Judge,
delivered the opinion of the court:
The claimant, being a tanner, engaged in the production of leather needed by the United States during the war and particularly as involved here, in the production of a special upper leather which shoe manufacturers under contract with the Government were being required to use in the manufacture of Army shoes. It was not a commercial product.
Conferences, correspondence, etc., which resulted in the claimant taking on this particular line of manufacture were with one Fred A. Vogel. Signatures to letters indicate that he was probably the chief of the upper leather section of the hide and leather control branch of the Quartermaster General’s office, but the record furnishes no proof as to his authority to obligate the United States, if any he had.
The plan was to induce tanners to manufacture leather of the particular kind required by the Government but not, as to this particular leather, to manufacture it directly for *309 the Government. It was to be manufactured after adopted specifications for use in Army shoes for which the Government was then letting large contracts to shoe manufacturers. The claimant, with others, was informed of the letting of these contracts and it was no doubt represented and expected that an outlet would be furnished for all of this special leather which it was to manufacture through the medium of orders placed by the contractors for the manufacture of Army shoes. In furtherance of this plan the claimant was furnished with the names of concerns which had contracted to manufacture Army shoes and the shoe manufacturers were informed that the claimant could furnish the requisite leather. The plan worked with entire satisfaction for a time, the claimant produced considerable quantities of this special leather which it sold to the shoe manufacturers and there would apparently have been no occasion for a controversy but for the fact that rather unexpectedly the demand for this special leather ceased when the claimant yet had a considerable quantity of it on hand. Of that on hand some was under commitment to shoe manufacturers and as to that there was an adjustment, just how is not material, but as to the remainder the Government declined to assume any liability. In that connection it is to be said that the record, eliminating any question of authority, shows no agreement on the part of the Government to take or to pay for this surplus.
In view of the position taken by the claimant it might well be said that there is no occasion to discuss the question as to whether there was or was not an agreement on the part of the Government to take or pay for this surplus leather, since the claimant does not rely upon a breach of any such contract, and sue for resultant damages, but seeks solely to recover an expense which it incurred in converting this special leather into a commercial product so that it might be salable on the market. However, the suggestion is made as to the original situation because of the fact that if the United States had, by competent authority, contracted to take or pay for any surplus leather, it might furnish the consideration for an agreement to reimburse the claimant the expense of conversion as a proper procedure in *310 the minimizing of damages. But the conclusion being forced that there was no obligation on the part of the Government to take or pay for this' surplus, the claimant’s rights must be considered solely upon the basis of the transaction in conversion.
So far as the facts are concerned there is apparently no room for doubt that the claimant, having on hand this surplus of special leather which was not a commercial product, incurred the expense stated in converting it into a commercial product so that it might be disposed of on the market. The basis of asserted liability is apparently the telegram set out in Finding V.
The claimant’s contention is that it believed that the United States was obligated to pay for the surplus leather which it had on hand and that the request contained in said telegram that it should convert it into a commercial product in order that it might be disposed of on the market and thus relieve the United States of its obligation to pay for this leather carried an implied contract upon the part of the United States within the purview of the Dent Act to pay the expense of such conversion.
There is nothing in the record to show that this telegram if otherwise susceptible of the construction put upon it emanated from a contracting authority. It was signed “Wood Leather Byron” and it may be surmised that this signature incorporated the name of the Quartermaster General, an abbreviated designation of a possible leather section in the Quartermaster General’s office and the name of an official at the head of that leather section, but as to this there is absolutely no proof and we may not substitute a surmise therefor.
But aside from the question of authority there is apparent room for the suggestion that this telegram had no application to the situation so far as claimant’s surplus leather was concerned, since it does not fit that situation. It may readily be conceived that at this time when contracts were being canceled by reason of the armistice that telegrams were being sent out to tanners who had contracts with the United States for various kinds of leathers, and *311 that in sending them, out there was no attempt to fit the telegram to the particular case and that in this instance the claimant received a telegram which in its terms might well have been applicable to other tanners but which was not in fact applicable to it. It advised the claimant that the prospect of using “equipment and harness leather ” for further Government contracts was remote. The claimant was not then engaged in manufacturing equipment or harness leather. It requested that its recipient might take such steps as might be possible to convert leather which it had coming through on its contracts into leather suitable for other purposes, whereas it is determined, and in fact conceded, that the claimant had no “ contract ” to manufacture this special shoe leather for the Government.
It is to be said for the claimant that it no doubt in good faith interpreted this telegram as authority to convert its surplus special shoe leather into a commercial product, and that it incurred the expense it did in so converting this leather in the belief that it was authorized by competent authority so to do and that it would be compensated therefor. But if it had no proper basis for such a conclusion upon its part and there was in fact the incurring of no Adalid obligation upon the part of the Government to reimburse it for its expense incurred it must still be said that its good faith in the matter can furnish no basis for a judgment at our hands. Considering the claim as predicated upon a contract within the purview of the Dent Act to reimburse the claimant for its expense incurred in this behalf it must be concluded that the facts give rise to no such contract, and that if not deficient in that respect it must necessarily result that it was a contract wholly without consideration, due to the conclusion that there was no valid obligation on the part of the United States with reference to this surplus leather. It is but one of those cases of not infrequent occurrence where a loss results without a legal remedy.
Graham, Judge; Hay, Judge; Booth, Judge; and Campbell, Chief Justice, concur.